## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | CRIM. NO.: 1:09-cr-00005 |
| v. | ) | |
| | ) | |
| AMIFA KNIGHT | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL

Finch, Senior Judge

THIS MATTER comes before the Court on Defendant Amifa Knight's Motion For Judgment of Acquittal, or in the Alternative, Motion for a New Trial ("Motion"). A jury convicted Defendant of three counts of perjury for false statements she made at a suppression hearing in this case. She challenges those three perjury convictions on the grounds that the Government failed to prove the falsity, materiality, and willfulness of her statements. The Government opposes her motion on the merits and as being untimely. For the reasons discussed below, the Court denies Defendant's Motion.

### I.  BACKGROUND

Defendant was charged with six counts of making a false statement to a federal agent in violation of 18 U.S.C. § 1001(a)(2), four counts of perjury in violation of 18 U.S.C. § 1621(1) and one count of conspiracy to commit murder in violation of 14 V.I.C. §§ 922(a)(1) and 551(1).

(*See* Superseding Indictment, Doc. 45.)[1]  Her trial began on December 15, 2009 and lasted approximately one week.  At trial, the evidence showed the following:

On May 12, 2008, Amon Thomas and Shadrock Frett were involved in a shootout at Frett's apartment in St. Croix, United States Virgin Islands.  Dozens of rounds were exchanged and Frett and Thomas each sustained gunshot wounds.  Both were admitted to the Juan Luis Hospital (JLH) on that day.[2]  Amon Thomas was discharged on May 16, 2008.  On May 21, 2008, at about 3:30 a.m., six masked and heavily armed gunmen entered JLH, proceeded directly to Frett's room and shot him to death.  The ensuing police investigation revealed that the gunmen had entered the hospital through an employee entrance, proceeded directly to the surgical unit on the third floor, punched in an access code at the surgical unit door, entered Frett's room and murdered him.  A video recording of the area near the employee entrance demonstrated that the strike on Frett took under three minutes.

Because of the circumstances of the attack, members of law enforcement focused their initial efforts on individuals with access to JLH's security systems.  JLH uses an electronic patient record system known as the Medtech Information System or "MIS".  This system allows users to retrieve information about every patient admitted to the hospital, including their medical records and hospital room number.  During its investigation, law enforcement requested and received from the hospital an audit trail of all MIS activity concerning Frett.  That audit trail indicated that only two individuals – Defendant and one other clerk – accessed Frett's records on May 20, 2008, the day before he was murdered.  After discovering that Defendant was one of only two hospital employees to have accessed Frett's records, law enforcement obtained her cell

---

[1] Unless otherwise noted, all document references are to Crim. Case No. 1:09-cr-00005.
[2] Defendant, who works as an admissions clerk at JLH, was on duty the day they were admitted.

phone records pertaining to May 20, 2008.  They learned that Defendant's cell phone had been in contact with the cell phone belonging to Halik Milligan, Amon Thomas' brother.

On January 26, 2009, special agent Thomas Drummond of the FBI, along with officers of the Virgin Islands Police Department ("VIPD"), interviewed several hospital employees, including Defendant, concerning the May 21, 2008 hospital shooting.  During Defendant's interview she told the questioning officers, including S/A Drummond, that: 1) she did not recall if she knew Frett's room number on May 20, 2008; 2) she did not recall if she accessed hospital records to ascertain Frett's room number on May 20, 2008 and she did know what room he was in; 3) she never gave Frett's room number to anyone; 4) she did not call nor receive any calls on May 20, 2008, from either of two phone numbers assigned to phones used by her boyfriend, Halik Milligan; and 5) she did not know, before May 20, 2008, that someone would enter the hospital and kill Frett.

The following day, based on her January 26, 2009 statements to S/A Drummond, Defendant was arrested for making false statements to a federal agent.  After her arrest, Defendant was mirandized and again questioned by law enforcement officers, including S/A Drummond, Officer Luis Ortiz, and Sergeant Dino Herbert.  She began by denying any knowledge regarding the murder of Shadrock Frett.  The officers then presented her with a printout from the MIS which showed that someone using her unique login had accessed the system to view Frett's bed assignment on May 20, 2008 at 7:24 p.m., only hours before he was murdered.  They also provided her a copy of cell phone records which showed two phone conversations, one at 7 p.m. and one at 7:30 p.m., between her cell phone and Halik Milligan's cell phone on the night before the murder of Frett.  Defendant then admitted that: 1) Halik Milligan called her at 7 p.m. on May 20, 2008, and asked her to obtain Frett's room number; 2)

she then accessed Frett's patient records to verify his bed assignment; 3) at 7:30 p.m., she called Milligan back to inform him that she had retrieved the room number; and 4) Milligan came to the hospital about an hour later at which point she gave him Frett's room number.  Those admissions contradicted her statements made to S/A Drummond the previous day.

After the January 27, 2009 interrogation, Defendant was indicted for six counts of making a false statement to a federal officer in violation of 18 U.S.C. § 1001(a)(2). (*See* Indictment, Doc. 22.)   Defendant moved to suppress the statements that she made to law enforcement officers during her January 27, 2009 interrogation on the grounds that she had not been properly advised of her *Miranda* rights and that the statements had been coerced.  At the April 16, 2009 suppression hearing, Defendant testified that the interrogating agents did not properly advise her of her *Miranda* rights and that they intimidated her into making the alleged admissions, including by slamming down a chair during the interrogation.  (*See* Suppression Hr'g Tr. 120-121, 126, 129, Gov't Ex. 10.)[3]

S/A Drummond, Officer Ortiz and Sergeant Herbert testified at the suppression hearing and offered a contrary version of her interrogation.  They testified that, prior to questioning Defendant, she was read her *Miranda* rights from an FBI advice of rights form, that she signed the form, and indicated orally that she understood her rights. (Suppression Hr'g Tr. 37-41, 93.) They also denied intimidating Defendant or slamming down a chair during the interrogation. (*Id.* at 64, 82-85, 107.)

---

[3]   At trial, the Government only sought to admit certain portions of the April 16, 2009 suppression hearing transcript. On Defendant's request, however, the entire suppression hearing transcript was admitted into evidence as Gov't Ex. 10. (Trial Tr. Vol. IV at 92-100.)

During Defendant's cross-examination at the suppression hearing, the following colloquies, which formed the basis for the instant perjury convictions, took place between the Assistant United States Attorney and Defendant: [4]

> Questioning Attorney ("Q"):  If you could clarify this for me. If I understood you right, did you say that you recall going into the file to check his room because individuals were calling, wanting, I suppose, to visit[5] him?
>
> Defendant's Answer ("A"): Yes.
>
> Q: Okay. And that would have been the day before the shooting?
>
> A: Yes, that's the evening.
>
> Q: Well, the evening before the shooting?
>
> A: The 20th, I was working.
>
> Q: So, these – how many individuals called you that evening to ask about Frett's room or location?
>
> A.  About, he had three phone calls.
>
> Q: Okay. I'm not sure what you mean when you say he had three phone calls. People called him, or called you?
>
> A.  They called. For instance if the operator didn't know the room number at that point, because in admitting you have to change shift. The bed roster would be printed out for the day shift, if rooms, anything is changed, that's another bed roster. So maybe at that time the operator did not get a listing, and then it would transfer it to one of the clerks, and then she called, she asked for Shadrack Frett's room number.

(Trial Tr. Vol. IV at 102.)

> Q: When these individuals called to give, to ask for Frett's number, did you know the room number he was in?

---

[4] At trial, sections of the suppression hearing transcript relevant to Defendant's perjury charges were read into the record by the United States Attorney and Officer Herbert.  (*See* Vol. IV at 101-108.)

[5] In one repetition of this conversation, the trial transcript erroneously replaces the word "visit" with "investigate." (*See* Vol. IV at 101.) This appears to be a typographical mistake as the trial transcript later uses the word "visit" when repeating this same conversation. (*Id.* at 102.) Additionally, the suppression hearing transcript from which Officer Herbert was reading also uses the word "visit" not "investigate."  (*See* Suppression Hr'g Tr. at 134.)

A: Not at the time.

Q: How did you find out?

A: I went into the computer. I put in his three letters of his last name, three letters of his first name. And his whole name, everything came out on the first page. And to get the room number, I would have to go to the last page to see what room he's in.

Q: How many times did you do that that night, before the shooting?

A: Three times, three or four.

Q: Within what space of time?

A: I don't know exactly what space of time.

Q: Well, what I meant was, you came into work three o'clock that evening – that afternoon, sorry. Three-thirty?

A: Three-thirty.

Q: So these individuals were calling. Were they calling in the afternoon, or the night?

A: They were calling in the evening.

(*Id*. at 103-105.)

Q: Okay. And is Hallick a friend of Shadrack Frett that wanted to visit him as well?

A: Yes, he is.

Q: Is he a friend that wanted to visit him as well?

A.  Yes, he is.

(*Id*. at 107.)

Defendant was acquitted of the false statement and conspiracy charges and convicted on three of the four perjury charges.  Defendant now moves for an order or acquittal or new trial on the grounds that the evidence was insufficient to sustain her perjury convictions.

## II.    STANDARD OF REVIEW

A motion for a post-verdict judgment of acquittal under Fed. R. Crim P. 29(c) requires

the district court to "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001); *see also United States v. Salmon,* 944 F.2d 1106, 1113 (3d Cir. 1991) (Court must "determine whether a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses."). The court must "draw all reasonable inferences in favor of the jury verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996). "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992) (quotation omitted).

This standard is "highly deferential" toward the jury's verdict. *United States v. Hart,* 273 F.3d 363, 371 (3d Cir. 2001) (citation omitted). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Serafini*, 233 F.3d 758, 770 (3d Cir. 2000). An insufficiency finding should be "confined to cases where the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (citation omitted). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt," may the Court overturn the jury's verdict. *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1990) (citation omitted). "To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilty." *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990) (citation omitted). "There is no requirement . . . that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation." *Iafelice*, 978 F.2d at 97.

7

III.   **ANALYSIS**

a.   **Defendant's Motion for Acquittal is Untimely**

On December 30, 2009, eight days after the verdict, Defendant moved for an extension of time within which to file her Rule 29 motion on the grounds that she needed the trial transcript to properly draft the motion.[6]   (Doc. 86.)   The Court granted her motion and ordered that "Defendant will have thirty (30) days from the date that the trial transcript is filed with the Court to file her Rule 29 Motion."  (January 11, 2010 Order, Doc. 89.)  On March 4, 2009, Defendant filed a motion to continue her April 1, 2010 sentencing date on the grounds that she had not yet received the trial transcript and "[u]pon receipt of the transcript, Defendant Knight would need adequate time in which to review the documents and prepare her Motion and Memorandum of Law in Support of her Rule 29 Motion. An additional thirty to forty five (30-45) days would be needed in order to properly and adequately represent Defendant in this matter."  (Doc. 92.)  The Court granted her motion and continued her sentencing without date.[7]   Defendant's sentencing was subsequently rescheduled for July 14, 2010.

On July 1, 2010, Defendant filed another motion to continue her sentencing on the grounds that she needed more time to file her post-trial motion for acquittal.  (Doc. 100.)  The Government opposed her motion arguing that the time for her to file a post-trial Rule 29 motion had already expired.  The Court denied her motion for a continuance holding that the time for her to file a post-trial Rule 29 motion had expired on April 16, 2010 and that Defendant had "made no showing of excusable neglect for failure to file a timely Rule 29 Motion." (*See* July 8, 2010 Order at 3, Doc. 103.)   The Court also stated that "[b]ecause this is a motion to continue

---

[6] All further references to the "Rules" are to the Federal Rules of Criminal Procedure.
[7] The Court did not alter or revoke its prior order that Defendant's Rule 29 Motion must be filed within 30 days of the filing of the trial transcript.

sentencing and excusable neglect was not briefed by the parties, this Order is without prejudice to Defendant's ability to raise excusable neglect, should she elect to file an untimely Rule 29 Motion." (*Id*. at 3, n.2.)   On July 9, 2010, Defendant filed the instant post-trial motion for acquittal.

Rule 29(c)(1) states that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1).  Under Rule 45(b)(1)(A), a court may extend the time to file a Rule 29 motion "before the originally prescribed or previously extended time expires." Fed. R. Crim. P. 45(b)(1)(A).  Pursuant to this Court's prior Order, Defendant's post-trial Rule 29 Motion was due thirty days after the trial transcript was filed with the Court. (*See* January 11, 2010 Order.)   The Electronic Court Filing (ECF) docket reflects that the trial transcript was filed on March 16, 2010.[8]  (*See* Notice of Filing of Official Transcript, Docs. 93-97.)  Thus, Defendant's post-trial motion for acquittal was due on or before April 16, 2010. However, Defendant did not file her Motion until July 9, 2010, 85 days after the court-imposed deadline.  Defendant's Motion is therefore untimely.

Under Rule 45(b)(1)(B), the Court can extend the time to file a post-trial Rule 29 motion "after the time expires if the party failed to act because of excusable neglect."  The burden of proving excusable neglect lies with the party who made the otherwise untimely filing.  *See Jones v. Chemetron Corp*., 212 F.3d 199, 205 (3d Cir. 2000). The determination of "what sorts of neglect will be considered 'excusable,' . . . is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission . . . These include . . . the danger of

---

[8] In her motion to continue sentencing, Defendant acknowledges that "[t]he trial transcript was received on or about March, 2010."  (Doc. 100.)

prejudice to the [non-moving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *In re Cendant Corp. PRIDES Litigation*, 234 F.3d 166, 171 (3d Cir. 2000) (quoting *Pioneer Inv. Servs. v. Brunswick Assoc. Ltd. Ptrshp*, 507 U.S. 380, 395 (1993)); *see also United States v. Boesen*, 599 F.3d 874, 879 (8th Cir. 2010) (applying *Pioneer* factors to untimely Rule 33 motion).

Here, Defendant has not addressed excusable neglect, despite this Court's July 8, 2010 Order practically instructing her that if she still wished to file a late Rule 29 Motion, she would have to "raise excusable neglect" and make a "showing of excusable neglect for failure to file a timely Rule 29 Motion." (*See* July 8, 2010 Order at 3, n.2.)  Defendant's Rule 29 Motion is entirely silent on why it was filed 85 days late.  Accordingly, the Court finds that Defendant has failed to show excusable neglect and that her Motion is therefore untimely. *Boesen*, 599 F.3d at 879 (affirming denial of post-verdict motion for acquittal and new trial because defendant had failed to make a showing of excusable neglect)

### b. The Evidence Was Sufficient to Sustain Defendant's Perjury Convictions[9]

Perjury consists of four elements: (1) a false statement; (2) given under oath; (3) made willfully; (4) that concerns a material matter.  18 U.S.C. § 1621; *see also United States v. Moskovits*, 86 F.3d 1303, 1311 (3d Cir. 1996).  Defendant challenges whether the Government proved the falsity, willfulness and materiality of her statements beyond a reasonable doubt.

---

[9] Out of an abundance of caution, the Court will address the merits of Defendant's Motion.

### i. Falsity and Willfulness

Defendant contends that the evidence was insufficient to prove the falsity and willfulness of the statements charged in Count's VIII and IX.

### 1. Count VIII

Count VIII charges that Defendant committed perjury when she testified at the suppression hearing that, on the evening of May 20, 2008, she accessed hospital records for patient Shadrock Frett three or four times to obtain his room number.  Defendant contends that her statement was literally true because, as she claims, the evidence adduced at trial shows that she accessed Frett's patient record three times on the evening of May 20, 2008.

"In a perjury case, the plaintiff must prove that the allegedly perjurious statement is not subject to a literal, truthful interpretation." *Herring v. United States*, 424 F.3d 384, 391 (3d Cir. 2005).  However, neither the jury nor a court on a review of the sufficiency evidence considers a defendant's statement in a vacuum.  Rather, the falsity of a defendant's statement must be considered "in the context of the defendant's testimony." *United States v. Miller*, 527 F.3d 54, 77 (3d Cir. 2008); *see also United States v. Thomas,* 612 F.3d 1107, 1116 (9th Cir. 2010) ("Inquiry into the defendant's allegedly perjurious statement must begin with an appreciation of the context in which the statement was offered . . .").

Here, the evidence presented to the jury, in light of the context of Defendant's suppression hearing testimony, was sufficient to satisfy the falsity element as to Count VIII beyond a reasonable doubt.  At the suppression hearing, Defendant claimed that she accessed Frett's patient record in response to three phone calls that were directed to her by the hospital operator from individuals who wanted to visit Frett.  (*See* Vol. IV at 102-104.)  However, at trial,

11

the Government presented substantial evidence that Defendant concocted this story to hide the fact that she obtained Frett's room number solely at the behest of her boyfriend, Halik Milligan, and that doing so was a serious violation of hospital protocol.  For example, Nikita Ward, the hospital telephone operator on duty from 4 p.m. to 12 a.m. on May 20, 2008, the same hours that Defendant was on duty, testified that she received no calls from anyone requesting information about Shadrack Frett nor did she transfer any calls regarding Frett.  (Vol. IV at 188-191.)  Ms. Ward also testified that she does not give out patients' room numbers to callers. (*Id*. at 191.) Fred Pimintel, Defendant's supervisor, testified that it would be against hospital policy to give out a patient's room number to the public and that Defendant was aware of this policy.  (Trial Tr. Vol. III at 83-84, 89-90, 92-93.)

Furthermore, the jury heard testimony that Defendant admitted to law enforcement that she accessed Frett's patient record and obtained his room number on the evening of May 20, 2008 in response to a request from her boyfriend, Halik Milligan.[10]  (Vol. IV at 89-90, 216-218.) Officer Herbert also testified that Defendant accessed Frett's patient records and retrieved his room number only once during the evening of May 20, 2008, not three or four times.  (Vol. IV at 53-55.)  Defendant's statement that she accessed Frett's records "three or four times" was tied to her claim that she received three phone calls transferred from the operator requesting Frett's room number. (*See* Vol. IV at 102-104.)   The jury had sufficient evidence to reject Defendant's claim that she obtained Frett's room number in response to transferred calls and therefore also had a sufficient basis to find her statement that she accessed Frett's records "three or four times"

---

[10] The jury was also presented cell phone records reflecting calls between Defendant and Halik Milligan on the evening of May 20, 2008.  (*See* Gov't Ex. 2.)

12

false.[11]   The jury could reasonably have believed that she accessed Frett's patient record to obtain his room number only once – i.e. in response to a request from Halik Milligan.

Defendant asserts that her claim of three or four accesses is supported by the evidence. Specifically, she cites Reuben Molloy, Chief Information Officer of the hospital, who identified three possible access attempts to Frett's MIS record by Defendant on May 20, 2008 – at 4:22 p.m., 7:23 p.m. and again at 7:24 p.m.  (*See* Vol. III at 38-39, 44, and 51.)   However, when explaining Defendant's 4:22 p.m. MIS access, Molloy testified that Defendant only ran a "query" and could not have actually retrieved Frett's patient record at that time.  (Vol. III at 52.)  Indeed, the MIS audit trail upon which Molloy's testimony was based (*see* Gov't Ex. 1(A)), shows only that Defendant punched in "FR, SHA" at 4:22 p.m. and that no corresponding patient record was retrieved. [12]   Officer Herbert confirmed this when he testified that at 4:22 p.m. Defendant "made a limited entry, and for some unknown reason stopped."  (Vol. IV at 55.)  Mr. Pimentel testified that to access a patient's room number, a system user would first have to retrieve a patient's MIS record and then click on the "fifth tab."  (Vol. III at 79.)  If Defendant did not actually retrieve Frett's patient record at 4:22 p.m., she could not have obtained his room number.  Thus, the jury had ample evidence upon which to find that Defendant was lying to the extent that she meant to

---

[11]  Defendant was convicted on Count VII of committing perjury when she testified at the suppression hearing that she accessed Frett's records on May 20, 2008 because the operator had transferred calls to her from individuals who wanted to visit Frett.  Notably, Defendant does not challenge whether the evidence was sufficient to support a finding of falsity as to that charge.

[12]  In describing how the MIS database functioned, Molloy testified that in order to retrieve a patient record, a user would have to enter the first three letters of a patient's last name followed by a comma and then the first three letters of a patient's first name.   (Vol. III at 39.)  Defendant acknowledged this convention at the suppression hearing when she testified that in order to access Frett's record, she "put in his three letters of his last name, three letters of his first name, and his whole name, everything comes out on the first page. And to get the room number, I would have to go to the last page to see what room he's in."  (Vol. IV at 104.)  In this instance, she only punched in the first two letters of Shadrack Frett's first name.

include this 4:22 p.m. query into "three or four times" that she allegedly accessed Frett's room number.[13]

Defendant also challenges whether the evidence is sufficient to prove that she willfully testified falsely. The *mens rea* required to satisfied perjury's "willfully" element requires proof that the witness made the statement "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). In a perjury case "intent and knowledge may be proven via circumstantial evidence." *Serafini*, 233 F.3d at 770; *see also United States v. Chapin*, 515 F.2d 1274, 1280 (D.C. Cir. 1975) ("[P]erjury cases ... are susceptible to proof by circumstantial evidence, and in fact are peculiarly likely to be proven in this manner because one of the elements of the crime is that the defendant knew his statement was false when he made it.").

Here, viewed in the light most favorable to the Government, the evidence discussed above was sufficient to prove that Defendant willfully testified falsely. That evidence showed that Defendant retrieved Frett's room number once on the evening of May 20, 2008, not thrice as she claimed at the suppression hearing. The jury had sufficient evidence to reject Defendant's "transferred calls" explanation and could have reasonably concluded that Defendant invented the

---

[13] The jury also had sufficient evidence to find that either the 7:23 p.m. or 7:24 p.m. access attempt was not made for the purpose of obtaining Frett's room number. The jury heard Defendant's suppression hearing testimony wherein she stated that she had to retrieve Frett's room number from the "computer" because "I do not keep no one number in my head [sic]" and that she did not remember Frett's room number despite being asked for it three separate times by the alleged callers transferred from the operator. (Vol. IV at 105-106.) The jury could have reasonably inferred that Defendant would have remembered Frett's room number for at least the minute between the 7:23 p.m. and 7:24 p.m. access attempts, providing a further basis to find her claim that she accessed Frett's record three or four times on the evening of May 20, 2008 false.

story about retrieving Frett's room number in response to three transferred calls in order to make her access to Frett's records appear legitimate. This is a sufficient basis on which to find that she willfully testified falsely when she claimed that she accessed Frett's record three or four times to retrieve his room number. *See United States v. Kemp*, 500 F.3d 257, 296 (3d Cir. 2007) ("It is well-settled that untrue exculpatory statements may be considered as circumstantial evidence of the defendant's consciousness of guilt.") (quoting *United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir. 1975)).

### ii.   Count IX

Defendant also challenges her Count IX perjury conviction on the grounds that the statement charged in Count IX – "Halik Milligan is a friend of Frett who called on May 20, 2008 and wanted to visit Frett" – was literally true. She contends that the Government introduced no evidence, other than "pure speculation," that Frett and Milligan were not friends. She also claims that this statement was given in response to a question that was ambiguous as to the time period regarding Frett and Milligan's friendship and meaning of the word "visit."

The Court is not persuaded by Defendant's literal truth claim. At trial, the jury heard evidence that: 1) Shadrack Frett and Amon Thomas were involved in the same May 12, 2008 shooting incident and were admitted to the hospital on that day; 2) while recovering in the hospital, Defendant overheard Frett threaten to kill "the whole Amon Thomas family;" 3) Halik Milligan and Amon Thomas were "close" brothers and related by blood; and 4) Frett and Nathaniel Thomas, another brother of Amon Thomas, were involved in an "altercation" prior to the May 12, 2008 shooting. (Vol. IV at 73-75, 77-78, 91, 107, 203-204, 219, 223.) The jury could have reasonably concluded that Frett's threat was also aimed at Halik Milligan, who was a

15

member of Amon Thomas' family, and thus had ample grounds on which to find that Frett and Halik Milligan were not friends. The jury also heard testimony that, at some point between Frett's admission to the hospital and his demise, Defendant told a coworker that "he would not make it past the door."[14] (Vol. III at 168.) Viewed in the light most favorable to the Government, the above evidence is sufficient to show that Frett and Milligan were not "friends" on May 20, 2008 and that Defendant knew this but nonetheless claimed that they were at the April 16, 2009 suppression hearing.[15]

Defendant's argument that her statement was evoked by an ambiguous question regarding when Frett and Milligan were friends is equally unavailing. "[E]xcessively vague or fundamentally ambiguous question may not form the predicate to a perjury or false statement prosecution." *Serafini*, 167 F.3d at 820 (citation omitted). The general rule, however, is that, "in instances of some ambiguity as to the meaning of a question, it is for the petit jury to decide which construction the defendant placed on the question." *Id*. (quoting *United States v. Ryan*, 828 F.2d 1010, 1015 (3d Cir. 1987)). A response to an ambiguous question fails to serve as a predicate for perjury as a matter of law "when it is entirely unreasonable to expect that the defendant understood the question posed to [her]." *Id*. In determining whether a question is

_____

[14] The witness testified that, at the time Defendant made that statement, she did not understand that Defendant was referring to Frett. She also testified that upon learning of Frett's murder and the relationship between Milligan and Amon Thomas, she came to realize that Defendant was referring to Frett when she said "he would not make it past the door."

[15] Defendant contends that, accepting as true the Government's theory that Halik Milligan wanted to murder Frett at the time that he requested Frett's room number from Defendant on May 20, 2008, it was literally true that Milligan wanted to "visit" Frett. However, the falsity of Defendant's statement does not derive from what the word "visit" means, but whether Frett and Milligan were "friends" when Defendant gave him Frett's room number on May 20, 2008. And because the jury had sufficient evidence to find that Frett and Halik Milligan were not friends on May 20, 2008, Defendant's challenge to the falsity element of Count IX must be denied.

16

fatally ambiguous, a court must look at the context of the question and the surrounding questions. *Id*. at 821-22 (citing *United States v. Tonelli*, 577 F.2d 194, 198 (3d Cir. 1978)).

Here, the context of the questions that precipitated Defendant's statement, that Halik Milligan was a friend of Frett who called on May 20, 2008 and wanted to visit him, dispels any time period ambiguity claim. At the suppression hearing, Defendant was questioned about what transpired on May 20, 2008. (*See* Suppression Tr. at 134-144.) She explained that multiple people called asking for Frett's room number so that they could visit him in the hospital. (*Id*. at 134-139, 143-144.) During that line of questioning, the examining attorney asked Defendant "And is Halik a friend of Shaddrack Frett that wanted to visit him as well?" Defendant responded "Yes, he is." The attorney repeated the question and Defendant again responded in the affirmative. (Suppression Tr. at 144; Vol. IV at 107.)

The question about Halik Milligan was not ambiguous as to time because it closely followed other questions about what occurred on May 20, 2008, including questions about Defendant's claims that other people had called the hospital seeking Frett's room number so that they could visit him. The examining attorney's use of the phrase "as well" connotes that he was asking whether Halik Milligan was one of those individuals who called and wanted to visit Frett at the hospital. The jury heard relevant portions of Defendant's suppression hearing testimony and was given the entire suppression hearing transcript; it had sufficient evidence to find that Defendant understood the question as asking whether Halik Milligan and Frett were friends at the time that Defendant provided Milligan with Frett's room number – on May 20, 2008 – and not at some undefined prior time in history. Accordingly, Defendant's ambiguity challenge fails.

### iii. Defendant's Statements Were Material to the Suppression Hearing

Defendant also challenges her perjury convictions on the grounds that the Government failed to prove that the statements charged in Counts VII-IX were material.  At trial, the Government argued that Defendant's statements were material in that they went to her credibility as a witness at the suppression hearing.  Defendant contends that her statements were not material to the suppression hearing because "credibility was no longer at issue and only the constitutionality of her 'confession' remained at issue for the suppression hearing." (Def.'s Br. at 5.)  The Government asserts that the jury was provided evidence sufficient to show that Defendant's credibility was at issue at the suppression hearing in that the Court had to determine whether Defendant's confession had been illegally obtained based on the conflicting testimonies of Defendant and the agents who took her statement.

A false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it is addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)).[16]  The materiality requirement is construed broadly. *United States v. Chinnery*, 2003 WL 21469342, at *2 (3d Cir. 2003) (unpublished) (citing *United States v. Regan*, 103 F.3d 1072, 1084 (2d Cir. 1997)). A statement may be material under the perjury statute even if the decisionmaking body did not actually rely on the statement.  *United States v. McBane*, 433 F.3d

---

[16] Defendant also argues that the issue of materiality was never raised at trial and was not made a question of fact that the jury had to determine.   However, the jury was instructed that in order to return a verdict of guilty, it had to find each perjury element, including materiality, beyond a reasonable doubt and that "[a] statement is material if it has a natural tendency to influence, or is capable of influencing, the decisionmaking body to which it is addressed."  (*See* Jury Charge at 27-35, Doc. 80.)

344, 350 (3d Cir. 2005) (affirming conviction for making a false statement to a federal agency under 18 U.S.C. § 1001 and noting that "a statement may be material even if no agency actually relied on the statement in making a decision."); *see also United States v. Salazar-Samaniega*, 361 F.3d 1271, 1276 (10th Cir. 2004) ("For false testimony to be material, however, no court has held that it must have actually affected the result in the end; rather, if believed, the false testimony need only have possibly affected the result at the time it was given.").

A false statement about a fact not immediately at issue may nonetheless satisfy perjury's materiality element when it is "calculated and intended to prop and bolster the testimony of the witness on some material point," by "clothing it with circumstances which ... strengthen the credibility of the witness." *United States v. Weiler*, 143 F.2d 204, 205-06 (3d Cir. 1944), *rev'd on other grounds*, 323 U.S. 606 (1945) (citations omitted). Numerous cases have held that false statements by a testifying witness are material for the purposes of a perjury charge when those false statements are relevant to the witness' credibility. *See United States v. Slutzky*, 79 F.2d 504, 505 (3d Cir. 1935) (holding that false testimony by witness during criminal trial that he had not used an alias satisfied materiality element of federal perjury charge because it was relevant to his credibility as a witness); *Chinnery*, 2003 WL 21469342, at *3 (witness' false statements concerning his educational background satisfied materiality element of 18 U.S.C. § 1623 because "his inflated credentials clothed his testimony with circumstances that strengthened his credibility."); *United States v. McKenna*, 327 F.3d 830, 839 (9th Cir. 2003) (finding that false statement made by defendant at prior civil trial "were relevant to McKenna's credibility as a witness in her case against the government (a subsidiary issue then under consideration), and were thus material . . . "); *United States v. Sablosky*, 810 F.2d 167, 169 (8th Cir. 1987) (finding perjured statement that "related to the integrity of the evidence and Sablosky's credibility as a

witness" in a prior trial satisfied materiality requirement); *United States v. Scivola*, 766 F.2d 37, 44 (1st Cir. 1985) (finding defendant's false statement at criminal trial material when it "directly contradicted the testimony of several Government witnesses. If the jury believed this statement, it would have tended to disbelieve some of the testimony given by the Government's witnesses."); *United States v. Letchos*, 316 F.2d 481, 484 (7th Cir. 1963) ("Impeachment of a witness goes to his credibility and questions on cross-examination for this purpose may be material in the sense required for a perjury conviction.").

Not every false statement by a witness satisfies perjury's materiality requirement. "[C]ertain lies on cross-examination might be too trivial to count as being relevant to the question of credibility." *United States v. Akram*, 152 F.3d 698, 702 (7th Cir. 1998).  However, when the credibility of a witness is a paramount concern for the fact-finder – such as in a "he said, she said" case – false statements by that witness are more likely to be material.  *Id.*  This is particularly true at a suppression hearing, where the credibility of witnesses is often a crucial, if not dispositive issue for the Court.  *See United States v. Fox*, 393 F.3d 52, 61 n. 9 (1st Cir. 2004) *vacated on other grounds*, 545 U.S. 1125 (2005) (finding that false testimony at suppression hearing by Defendant regarding the circumstances of his traffic stop was material for obstruction of justice sentencing enhancement purposes (U.S.S.G. § 3C1.1) because it was designed to undermine law enforcement officer testifying against defendant); *Salazar-Samaniega*, 361 F.3d at 1276 (finding that false statement made by defendant at his suppression hearing was material for purposes of assessing obstruction of justice sentencing enhancement because if believed, "may very well have caused a more credulous court to grant the motion to suppress evidence."); *People v. Kirsh*, 575 N.Y.S.2d 306, 307 (N.Y. App. Div. 1991) (affirming perjury conviction

because defendant's false "testimony at her husband's suppression hearing was both material to the underlying charges and relevant to defendant's own credibility.").

Here, the jury was provided the suppression hearing transcript, which was sufficient evidence upon which for it to find that Defendant's statements at the suppression hearing were material to the Court's determination of her credibility.[17]  The transcript reveals that the main issues at the suppression hearing – whether Defendant was properly mirandized and/or coerced into confessing by law enforcement during her January 27, 2009 interrogation – were "he said, she said" matters and that Defendant's credibility played a significant role in determining the outcome of that suppression motion.  At the suppression hearing, Defendant testified that the interviewing agents did not advise her of her *Miranda* rights and badgered her into making a statement. (*See* Suppression Hr'g Tr. 120-121, 126, 129.)  The interviewing agents, on the other hand, testified that they read Defendant her *Miranda* rights and that they did not intimidate her during the interrogation.  (*Id*. at 37-41, 64, 82-85, 93, 107.)  In addition, both the Government[18]

---

[17] The Court acknowledges that the Government did not present much testimonial evidence at trial regarding the materiality of Defendant's statements to the Court's resolution of Defendant's suppression motion.  However, in reviewing the sufficiency of the evidence, a "jury's verdict will be overturned only when the record contains *no evidence*, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010) (quotation omitted) (emphasis added).  "[T]he reviewing court must treat all of the incriminating evidence as true and credible." *Id*.  Furthermore, the Court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on *the available evidence*." *Wolfe*, 245 F.3d at 261 (emphasis added).  The jury was instructed that it should consider "all of the evidence" in reaching its verdict.  (*See* Jury Charge at 6, 7, 17, 45.)  Accordingly, the Court must assume that the jury took the suppression transcript into consideration in finding that the materiality element of the perjury charges had been satisfied.

[18] "[S]ince the Defendant has testified and raised some issues which are some in sharp contrast to the government's evidence, then the Court has to make a call on credibility.  And to that extent, any testimony that she gave today that the government could show was false becomes very relevant . . ." (Supp. Hr'g Tr. at 161.)

and Defendant[19] acknowledged at the suppression hearing that Defendant's credibility was crucial to the Court's determination as to whether her confession was obtained in violation of her rights.  And at the hearing, the Court also recognized the significance of Defendant's credibility in resolving the suppression motion:

> This type of case, when I say type of case, situations in which a fact finder, a trier of fact has to weigh credibility, requires close examination of what was said by both sides, and what was said by the parties, witnesses of each side . . . And if your argument, and it seems to me to be so, if your argument is cutting close to and very heavily on relying of the credibility of your side, as against the credibility of the defendant's statement, you've got to put into sharp focus what these differences are and line them up for me to examine.

(Supp. Hr'g Tr. at 161-162.)   Thus, the jury could reasonably have found that Defendant's credibility was a material issue at the suppression hearing.

The jury could also have found that the statements charged in Counts VII-IX were material to the Court's determination of Defendant's credibility at the suppression hearing.  As discussed above, the jury had sufficient evidence to find that the statements charged in Count VII and VIII – that Defendant retrieved Frett's room number in response to calls transferred from the hospital operator concerning individuals who wanted to visit Frett; and that Defendant accessed Frett's patient record three or four times to retrieve his room number on the evening before he was murdered – were part of her attempt to legitimize her access to Frett's room number by making it seems as though she did so in response to multiple requests for his room number by people wishing to visit him.  Similarly, the jury also had sufficient evidence to find that the statement charged in Count IX – that Halik Milligan was a friend of Frett who wanted to visit him – was part of that same cover-up story.  Thus, her statements were not trivial lies.  The jury

---

[19] "And when the Court looks at the totality of the circumstances under which the young lady was questioned, taking into consideration the varying testimony from the different officers that was present, and of course, weighed against what Miss Knight indicated . . .  I do agree there should be some leeway to credibility…"  (Supp. Hr'g Tr. at 164.)

could have reasonably concluded that if the Court had believed those statements to be true, it would have been more likely to believe Defendant's claims that police officers had violated her rights during the January 27, 2009 interrogation.  This is sufficient to sustain the materiality element of her perjury convictions.

### c.  **Defendant's Motion for a New Trial**

Defendant advances no additional arguments in support of her Motion for a New Trial and has therefore identified no basis upon which to grant her a new trial.  Having found the evidence sufficient to support Defendant's three perjury convictions, the Court denies Defendant's Motion for a New Trial.

### IV.   **CONCLUSION**

For the reasons stated above, it is hereby

**ORDERED** that Defendant's Motion For Judgment of Acquittal, or in the Alternative, Motion for a New Trial is **DENIED**.

ENTERED:

**DATED**:       February 18, 2011          _____/s/_____
                                             RAYMOND L. FINCH
                                             SENIOR U.S. DISTRICT JUDGE